Thank you. Counsel, you may proceed. Thank you. May it please the Court, good afternoon. My name is Anne Traum, and I am representing Jaquan Richard. I would like to reserve five minutes for rebuttal, and I will try to keep my eye on the clock. As the Court is aware, this is an appeal and cross-appeal. My plan is to focus first on the playback issue, then on the denial of the motion of the evidentiary hearing on the motion to suppress, and finally, briefly, on the government's appeal, claiming that a matter of robbery is a qualifying violent felony under 924E. First on the playback issue. I have a question on the playback issue. What is our standard of review? There's an issue here in terms of whether the objection was made on a timely basis or not, in which case it would be plain error, perhaps, rather than our normal either abuse of discretion or some other standard. What's your advice? Well, I think the standard, the regular standard of review is abuse of discretion, and that should apply here, because counsel, defense counsel, made an objection after the Court told the jury that it would allow, that it would cue up the tape to play just a portion of the tape, but before any portion of the tape was played, the testimony, presumably the transcript. The testimony and cross-examination is what their notes said. Right, right. But presumably the transcript. And at that point, I didn't see any objection. There was no objection. And at that point, actually, there was, we can see that they never, defense counsel never made an objection that nothing should be played, which would be the sort of first level of objection, which would have been appropriate at that point to say no readback whatsoever. And we're not making, we're not claiming on appeal that we made that objection. Right. What we are claiming on appeal is that when that, when that happened, the jury came back, they said they wanted the testimony and cross-examination, that was clear in their note. The Court then directed, the Court then talked about whether, the fact that there was no transcript, but then even, but then the Court said, well, actually, I guess we could play back the testimony, and then it directed the jury to go back and decide what portion of the transcript they wanted to hear. Now, at that point, defense counsel still did not necessarily have a basis to object, because it's possible that the jury was going to come back and have, unlikely but possible that they would still want the entire thing. Alternatively, they might want something that was, for example, the last bit of direct and the entire cross-examination, in which case we might also not have a problem with that in terms of fairness to our client and the interests that we're trying to protect. What the jury did then was come back and say that they wanted, that they wanted to hear the, the last, the portion of the direct testimony after the sidebar towards about the beginning of cross-examination, and that's when the Court said, from the sidebar to the beginning of cross-examination, and the jury answered yes, right around the time she was being asked to identify the defendant. So it was clear that the jury initially wanted testimony in cross-examination. Then it was clear that they planned to focus on the ID of, of the witness's ID of the defendant. And then, but before they heard anything, defense counsel said that we, that defense was objecting. We wanted the entire cross, we wanted the entire testimony played. And the whole nature of, of objecting is not simply that you do it before the judge has made a decision, but you do it in a timely way so that the judge has an opportunity to address any problem with that decision, or even if you're too late, to then mitigate the decision the Court has already made. And here we're actually back to the, we, he actually has time to prevent any prejudice from this by playing both the testimony and cross-examination, which, importantly in this case, would have been faithful to the jury's original requests before the judge interfered and asked them to, to be more specific. Were you the trial counsel? No, I was not. So, in answer to your question, I believe it is an abuse of discretion standard. And more importantly, I think that what this, how this played out was that unlike in some of the other cases where we have merely an abuse of discretion in the failure to mitigate the danger of undue emphasis, and it's because the undue emphasis danger is really what motivates the Court in all of these cases, that in the, and the Court has said there is a need to mitigate that danger. Well, in terms of what the jury actually heard, it seemed to me that they were both pro-defense as well as pro-government passages. It wasn't all biased, or at least, it wasn't all focused on the ID, was it? It wasn't all focused on the ID. We know that they were interested in the ID from what they said on the record, and that, by the way, was at 277 in the record. You're correct. I mean, the ID in this case is so stunningly bad that, that, to get the portion that they did was damning to the, to the witness. Yeah, I can't remember, I can't remember the last time I've read a direct examination where the prosecutor asked the key witness in a case, do you see this man in the courtroom, and the witness says, no. So, picking up on that, Your Honor, what they missed, because they were played pages 122 to 132, so that was 10 pages of testimony, and during that testimony was the time when, by this point, she has said, and this is what they didn't hear. They didn't hear that three times earlier she said no, and then she stood up and she was asked to look around, do you see anybody? And she looks around, and then she again says no, that she didn't see him. That's, that plays out on 117 and 118 in the record, okay? So they didn't hear that. They do hear the part which is damning to the witness, where by this point, there had just been a sidebar about her identification at the grand jury, and by this point, she is sitting there with a picture of the defendant in her hand. She has been guided through the fact, this is at 123 and 124 in the record, she's been guided through the fact that she positively identified this person based on this picture earlier, and now she's being asked to basically, does she see anybody around here who kind of matches this picture? And that's when he's, when the prosecutor says, this is stunning, the person sitting at the defense counsel table as the defendant, is that the person in that exhibit, in that photograph? Then she's still not sure. She says the boy looks like him, but he was smaller, so I don't think he's in here. And then it's followed up by the next question, whether the defendant in this  And finally, she comes around. So they did hear that, and that was damaging. But what they missed, and then she goes on to sort of say the facts of the case, which is she saw him with the gun. What they did not hear was a traditional function of cross-examination, which is this woman has a motive to lie and has an inability to remember, not just what the defendant looked like in the courtroom, but to be consistent on a lot of other details in the case about the relationships of the people and where they had been and what they had been doing. The fact that she was the other, you know, we have to remember, step back here. Four people in a car, one eyewitness, two felons. The other felon is her boyfriend, the brother of one of her best friends. She claims, so she's unclear about all of those details, which is the traditional function of a cross-examination and what was left out here. And what's important here is not just the eyewitness, but what we know about the jury. There are so many notes in this case. And those notes tell a story of a jury that is trying to find corroboration for what she said, because, and these are displayed on page 34 of my first brief, and they're from 291 to 297 in the record. But those issues that the jury is talking about, they want to know who was Schneider, the white man also sitting in the back seat, and was he actually drunk, as she said. They want to know who was arrested. How can somebody have hidden the gun in this place, known where to hide it? They were dubious that Martin was the owner and driver of the car. She knew Martin. She had been in the car before. It's unclear that somebody would have known how to do that. And they also wanted to know how did they find out about the gun in the police report and who else was arrested. There are a lot of questions that the jury is very specific and very detailed in trying to piece together what was a rather confusing presentation of the unrave of the how the unfolding of the investigation, as well as trying to find some way to corroborate the details of what she is telling them. Because there's no question about the police, what the police say. There's no question that this gun was found in this place and that that's where this person was sitting. But what's troubling them is why does this woman not know any, why is she so unclear on the details, and how did the gun get there? And that's what the story that those other notes tell us, which really goes to the harmlessness. I think that this case, I mean, we have the Hernandez case. And I know that the government's gonna say that we've never reversed a case based merely on the failure to replay. Well, I mean, to play back the entirety of the, play back the entirety or provide an entire transcript. And I think that that's correct. But the fact is that most courts actually get that part right. That's sort of the first step. And that first step didn't happen here. And in Hernandez, I think what is, what is, makes this case so much stronger than Hernandez. Because in Hernandez, it was a similar situation where the jury requested the testimony of one of the police officers. The court first sort of gave him almost something akin to an Allen charge, which was sort of said, go back and just keep thinking about it and rely on your memory. So that was the first step that they did. Then the court said that they were interested in the ID. And the problem there was that even though in response to that, the court provided an entire transcript, which this court said was correct. But it wasn't enough because the risk of undue emphasis was that the court was, the jury was going to really focus solely on that ID. The judge knew it because that had been communicated and didn't, and yet the judge failed to admonish the jury to consider the entire testimony and rely on their memories. That was an abuse of discretion. Now, if that is an abuse of discretion in a case in Hernandez where you actually had two IDs, there were two police officers, and maybe one ID was much stronger. But there were still two people who identified this defendant. I don't see how in this case where you have one ID, one of the worst IDs that could possibly be imagined. And if we look finally at what the judge had to say about this, there's no reason stated in his reasons for denying defendants timely requests to say, wait a minute, I actually think we need to have the entire testimony. The judge's comments are 281 of the record. And I don't think I need to repeat those. It's just clear that he first talks about untimely, but as I was responding to Judge O'Sallen's question, it's clear that no prejudice had been done here. There was nothing to be undone. It could have been done. It could have been corrected. And second of all, it seemed to me that the judge is obviously concerned about his self-image in front of the jury. Now, what- In your view, what should the judge have done? The judge could have easily responded by playing the entire testimony back. The entire testimony of what, the witness? Mm-hm. And it was short. So if this is not a case, for example, where someone's on the stand for three days or a week, and there's actually sort of a time need to pare that down to focus the jury, and then you could have other issues. But this is, it only took 15 minutes to play back a quarter of her testimony. It couldn't have taken more than an hour to play back her entire testimony, and it took them more than an hour to actually be able to hear anything back anyway. So this is a very short witness. It would have been easy to do. The court could have said, just rely on your memories, which would have been fine, although, as I can see, there was no objection to that. Or it could have been responsive to the defense counsel's objection and simply played the whole thing. She is the key to the case. And they obviously had a reason for writing in cross-examination on their note. So if I could, I'd just like to briefly go to the court's question about- Can I ask you just one question? Of course. If we agree with you on this replay issue, do we reach any of the other issues? Well, I think we might be entitled to, I mean, my position would be that we'd be entitled to, we may be entitled to an evidence you're hearing on the motion to suppress, in which case, I don't think you need to reach the sentencing issue, possibly the suppression issue. So I do want to briefly talk about that, which is that I think that this court asked us to be prepared to talk about Dies Castaneda. And I think that this case is distinct from Dies Castaneda, and I just want to trace that out. In Dies Castaneda, this court recognized that a passenger has the ability to challenge their own detention. There were some other issues in how that played out there. They also, this court also talked about the case Hibble, or Heeble, the Supreme Court case, which said that you can request an identification from a passenger, or no, not from a passenger, from a person during a legitimate Terry stop. I think it's important to stop there and talk about what Hibble said. Hibble is a Nevada case based on the Nevada statute, and it talked about there being reasonable suspicion as to that suspect when they stopped that suspect. Roberts, is the right in this focused framework the right of the passenger not to respond or to decline to provide identification, or is it that the law enforcement can't even ask? I think it's the right not to respond, and I think that that's the distinction between INS v. Delgado and Hibble and Brown v. Texas. Okay. In this case, your client did respond. He did respond. And he responded with information that was incorrect, turned out to be false. Correct. Although we have ---- Okay. Once someone in that situation, a passenger, has been asked for identification and responds, doesn't decline to the question, but responds and gives law enforcement information which, in fairly short order, proves to be false? We don't know how short order. Well, that's ---- Concede to that point. Okay. But once a passenger responds and gives information that turns out to be incorrect, are we in a different focus? You know, I don't think so, and I think it's because we don't know how that information came out. The passenger in this scenario not only has the right not to respond, they have the right to give false information. I think that the question then becomes whether the false information triggers a reasonable suspicion as to a passenger to whom we had no reasonable suspicion before because he was just a passenger. And so then the question becomes, I think, then a different calculus, and that's what makes this different than Diaz-Castaneda, because this person is being detained after a traffic stop. He is now in his own detention because the traffic stop has ended. And the question is whether that false information, accepting that it was false, okay, we don't know how the false information came to light. We don't know what database they were looking in to check who he was and what the conversation was. We don't know. We don't know. You don't dispute that the officer was within his rights in asking for I.D.? During a traffic stop. Right. I think that's ---- I do dispute that, actually. I'm not sure that I found a case, and I have looked, that says that you can ask a traffic stop, someone who is not the subject of any suspicion, to identify themselves, because that's not what Hibble says. Hibble says you can ask a suspect during a reasonable Terry stop. Doesn't our recent panel decision that we asked you to comment say just that? Yes, except that Diaz-Castaneda is a slightly different situation, because in Diaz-Castaneda, it wasn't just asking a passenger. It was, one, asking him and only detaining him during the traffic stop itself. That makes it different, because ours gets extended. Two, in Diaz-Castaneda, they actually had a reason to ask him that, which is they wanted to make sure, based on their policy, that he could drive the car home. And that slightly changes their ---- sort of what they're doing and why they're doing during a lawful traffic stop. Once that traffic stop has ended and you've got someone standing there ---- Doesn't the panel describe that as an additional reason? They do describe that as additional reason, but I do think factually that was guiding their sort of bypassing Hebel in a different way. So I will sit down and reserve now my two minutes and come back. You may do so, counsel. That's fine. We'll hear from the government. Counsel, you may proceed. Thank you, Your Honor, and good afternoon. My name is Robert Ellman for the United States. May it please the Court, I'll address the issues raised so far. The first has to do with the playback of the audio tape during the trial. And I realize in the transcript the judge stated in making the Court's ruling that the objection was untimely. However, as opposing counsel has pointed out, the objection was made before the audio tape was played back to the jury, and there was an opportunity to correct an error if there was an error in the first instance. So we agree that ---- So you're conceding abuse of discretion? Correct, Your Honor. So where does that leave us? First, does a court have an ability to play back part rather than all of a witness's testimony? And I think the answer has to be yes, because the decisions acknowledge that there is an amount of discretion to be employed here. This is a key witness, you concede that? It is a key witness, Your Honor. The key witness. I wouldn't say the key witness, because there was other evidence beyond her testimony which ties that defendant up to that gun. And this, if I understand the scenario, the car pulls over, the driver and passenger check their ID, it checks out, they go into the casino. Mr. Richard is then interrogated, and at some point during the conversation with law enforcement, he tells them that the driver is pimping out the girl who's in the front seat, right? All correct, Your Honor. And then law enforcement goes in the casino and brings that pair out. And sometime during that conversation, does the woman who was in the passenger seat describe that Richard may have had a gun? I don't believe that's correct, Your Honor. What is the sequence? You have the sequence correct. You have this rather lengthy period of time. First, Officer Prager activates his siren and his lights.  And then after approximately one block, it turns into a casino parking lot. Still, rather than stopping, it goes up the parking ramp and then stops. Yeah. Okay. I'm not voicing in these questions any concern about the nature of the stop. What I'm asking about now was, isn't it correct, regardless of the amount of time that went on, that ultimately the woman that Richard had said was, quote, being pimped out, tells the law enforcement that he's had a gun in the car? No, Your Honor. The person who tells law enforcement that is Mr. Schneider. The driver? No. He was yet another passenger. The passenger in the back seat? Correct. Who was also a felon? No. Mr. Martin, the driver, was a felon, as was the defendant. Mr. Schneider was someone they had met earlier in the day. And I believe he was paying for a ride. And Ms. Reeder was the front seat passenger and Mr. Martin's girlfriend. Okay. Was any of the things that we've just discussed read back to the jury? No. I don't believe so. Okay. I think now Ms. Reeder. And was the lengthy period of time during which this witness three or four times couldn't identify the defendant, was that read back? I don't believe so. I think that was omitted. Okay. The identification, we can see the identification was uniquely terrible. I mean, there's no question about that. And I don't disagree that Reeder is an important witness, but I needed to correct you, Your Honor, because I think you're under the mistaken impression that it was Ms. Reeder who told police that there was a gun in the car. Thank you for correcting me. I'll put that out of the calculus of my question. But my point is that the first three or four times she couldn't identify this defendant who was, what, 20 feet from her? That's a reasonable estimate, I'm sure. And couldn't identify him when they said, well, how about the guy at the defense table? How about the guy sitting next to the lawyer? None of that's read back to the jury, right? Well, the jury observed all of that in the courtroom, and I don't think anyone would be thinking that. Well, that's the point of a readback, isn't it? Well, not in this instance, and I'll tell you why, Your Honor, because what you're trying to get at, I believe, is the prejudice of reading back only part of Ms. Reeder's testimony. But the theory that opposing counsel keeps talking about and which was offered to the jury was that Reeder was not credible because she had a motive to implicate Mr. Richard because she was Martin's girlfriend at the time. Well, if that were the case, then one would expect her identification of Mr. Richard as the person who held the gun to be ironclad and immediate without any hesitation. Her failure to unequivocally identify him quickly in court as she was looking at him actually undermines that theory, and that's the part that she's complaining about, I think, was not read back to the jury. Well, whosever theory it undermined in a criminal case with liberty at stake with a witness that is this, as you've described, terribly insecure, terribly inappropriate in their ability to identify the defendant in the case without being hit over the head with a two-by-four, they hear a narrow readback of what the testimony was. How can that not be prejudicial? Because the only issue I've heard so far that this is supposed to have prejudiced the defendant on is identification, and this simply would not have helped the defendant in that vein. There's no question that Mr. Richard is the person who was sitting in the back seat where the gun was found. Mr. Schneider was the other person in the back seat, and Martin was the driver. It could not have been anyone but the defendant who was identified positively by the police officer who testified. So I don't understand where the prejudice comes in. It sounds like a great deal, but when you boil it down to what the defendant's theory was, this didn't hurt the defendant's theory. And one would expect, if it had, that there would be a great deal of cross examination on this issue, because the complaint is that the cross examination was not played back. But if you examine that, there is virtually no cross examination on this point at all. The prosecutor ---- Well, this may be one of those unique situations where the direct examination was more damaging to the witness than the cross. It may well be, Your Honor. But I would urge you to read that. The cross examination, as opposing counsel stated, is not lengthy. And I urge the Court to read it in its entirety and make a judgment about whether there's any significant prejudice arising from the fact that the jury didn't hear that twice. Doesn't its mere brevity argue for its complete reading? It's a factor to be taken into account, and I think the better practice would have been to do exactly that, Your Honor, and I can see that. What was the government's position about this? That it wasn't necessary. I believe the trial prosecutor, his only comment with respect to this was the jury has now identified what they wanted to hear, so let's let them hear that. There's no ---- The better practice is also, and the Court did do this correctly, to play it back in the presence of the Court and the defendant and counsel, which he did do. But the manner in which this arose was unfortunate, but again, we've conceded that the standard is abuse of discretion. You know, sometimes when you're prosecuting a case, you try to clean up the record the best you can, and if you think it's not going to hurt you, read it all back. How can it hurt you? Agreed, Your Honor. I don't know whether the prosecutor knew about the Binder case in this Court's case. When this came up, they didn't research it. They simply responded to the questions as they arose. Okay. Counsel, what troubles me about this issue, if we apply the abuse of discretion standard, is the Court's reason that he gave for not reading it back. It doesn't sound like a very good reason. Well, which reason are you referring to, Your Honor? The reason that he gave when counsel objected and he said something to the effect that, I don't know what he said, that he would look bad in front of the jury. Yes, Your Honor, I know what you're referring to. What he said was that the defense attorney was trying to make him look like an idiot, and it's page 280 in the record. Yeah, that's not typically the kind of legal reasoning that a district court judge would employ. Plus, if you had a good reason for only playing back certain portions, typically you would also tell the jury to also consider all of the evidence and this is just that one part and not to place an undue emphasis on it. And he didn't do that either. You're correct, Your Honor. Well, what's your response? Why is that not an abuse of discretion? Well, even if it is an abuse of discretion, relief remains inappropriate absent a substantial prejudice. So you have an error by the Court, but it can be harmless, which is really what I'm arguing. And actually, I don't want to go quite that far, because there's no per se rule that would have precluded the Court from playing back part of the testimony. You don't find a per se rule in this Court's case law. Well, of course not, because every trial is different. And the testimony may be three days long. Right. So, no, of course not. But typically, you wouldn't play back just such one-sided aspects. And then I'm searching for the closing. I thought I brought it up here with me. But what were the points that the government made in closing argument? Well, I've read this once, and I'm not working off of my notes. Were you the trial lawyer? I was not, Your Honor. Because my understanding from my memory of looking at this the first time around was that, in fact, the government did rely on the identification in closing as one of its key points. I don't think the identification of the defendant was really a critical issue at all. I mean, the defendant, I believe, effectively conceded he was in the car and he was seated in that seat. He was in the car, but it wasn't his gun. Yes. He claimed that he didn't possess the gun. And the value of Ms. Reeder's testimony was that she was the eyewitness who said he had it in his hand. He made a statement when the siren and lights were activated that he had warrants, you know, he had a gun, he had to get rid of the gun. Was that read? I don't recall whether that was in the readback, Your Honor. And I apologize for not rereading that before I walked up here. It was part of her testimony. I don't recall whether it was part of the readback. I understand, Your Honor. But, again, this point necessarily resolves on prejudice. And what opposing counsel stated was that this is a jury attempting to find corroboration for Reeder's statement that defendant possessed the gun in the car. And there was plenty of it. First, the witness who told police in the first place that the gun was under defendant's seat was Mr. Schneider. When police looked for the gun, it was exactly where Schneider said it was, and it was exactly where Reeder said it was. Reeder also gave a description of the gun, and the gun matches that description. And, finally, when he was interviewed, the defendant admitted that he may have touched the gun. He did deny that he touched it on that day, but he said he may have touched it in the past, in effect. Given those facts, I think the corroboration was ample. And when you boil it down under the circumstances, you really can't say that the failure to merely read back part of the direct examination and all of the cross-examination prejudiced this defendant on this record. And that's why I don't think relief is necessary or appropriate on that point. Your Honor asked about the Diaz case, and I'd like to address that as well. The argument is that defendant was unlawfully detained and that the gun was stolen. The magistrate found that the detention, regardless whether it was unlawful, should not result in suppression of the gun because the discovery of the gun was not caused by the detention, regardless whether it was unlawful. And that goes to your point about the information they got that day, Your Honor. The car was lawfully stopped because it had a fake registration sticker. That's when I don't think anybody's disputing that. I think it's also clear under Diaz that police had the right to ask the defendant for identification as a passenger. And he had the right to object to the lawfulness of the stop. But as I said, the lawfulness of the stop doesn't appear to be in dispute. So what happens next is the length of that detention, you know, at some point does that become unlawful? And even if it does, did that detention cause police to find the gun? And the answer to both is no. The detention didn't cause discovery of the gun. And that's actually a point that I believe was misrepresented to the magistrate, although she ruled correctly on it. The defendant did not say anything in that interview that prompted the police to search the car. And I point you to page 11 of the excerpts when they moved for a hearing on this issue. That was the representation made. That isn't correct. He said that there was pandering going on. And in order to investigate that, other police went into the casino, found the other occupants of the car, including the driver, Ms. Reeder, and Mr. Schneider. They brought them back. And at some point after that, according to the testimony, approximately one to two hours after the stop, Mr. Schneider stated that there was a gun in the car. They weren't interrogating him about a gun. They didn't know anything about the gun. But he volunteered that there was a gun in the car. Everything else flowed from that. It was not initially found, was it? No, it was not. It was hidden underneath the cover. It was not found until the vehicle's inventory did? It was not found in the inventory. They got a warrant, actually, to find it. They did an impound, and they didn't see it. It was a bulge under the seat at that point. What was the theory of how Richard got the gun inside the seat so quickly? Well, the theory is that the delay between the time the siren and lights were the seat, and the photos of the seat are in evidence. They're reproduced in the record. You can take a look at where that gun was, although I can't assure you that after you look at the photographs, you'll have a very clear idea that they are in the record, ER 60, 62, and 64, I believe, are the photos of it. So that's why I say the magistrate was correct in determining that the gun didn't flow from the detention, regardless whether the detention was lawful. But I also contend that the detention was lawful, because after you get past Wren and Diaz, now you're into the high bell case. And police didn't simply stop the car. That's not the entire context for what happened next. There was that inordinate delay. And Officer Prager testified that in his experience as a police officer, when you have an inordinate delay of someone pulling over, it means either that someone in the car is going to bail, by which he means attempt to escape, or someone in the car is trying to hide contraband. And those two concerns are not particularized to the driver. They go to every occupant in the car. He testifies to that point at pages 90 and 91 of the record. So police have more than this fake registration sticker when they pull that car over. And what happens next is extremely important. He asks identification of all four occupants. Three of the occupants give him correct, verifiable identification. Suspicion diminishes as to those three, and what does he do? He lets them go. The only person for whom suspicion is not diminished is Mr. Richard. And he didn't merely refuse to give identification. He affirmatively misled Officer Prager by giving him false information. Now, at that point, under High Bell, you have a situation where you have reasonable suspicion and a defendant who refuses to identify himself. And under High Bell, police are permitted to actually arrest the defendant at that point because they have probable cause to find that he's violated a valid Nevada law that requires him to produce correct identification at that point. So for either of those reasons, it should be affirmed. And then finally, I did want to address the cross appeal, at least briefly, in my remaining time. The issue is whether the court erred by finding that robbery under the Nevada statute does not require a threat of force. It rests on the court's misinterpretation of a Nevada State case called Hayden, 538 P. 2nd, 583. Hayden quotes a much earlier case called Lujano and says that robbery is a way to create an apprehension of danger. I think that's definitive. I think that answers the question. I think that means there was error here. When Judge Mahan decided that the Nevada statute did not require a threat, he looked at Hayden and said, well, that's just discussing the old English common law because the original language comes from Blackstone. Counsel, the problem, though, is the reference to the word property in the definition of robbery. Actually, I don't think that's the problem here, Your Honor, because the court also engaged in a modified Taylor analysis and looked at the charging instrument, which says specifically that this is a threat to injury to the victim in that case. So while the statute may have been overbrought in that respect, it did not engender any error here. If you look at footnote one of the Hayden case, it says that the analysis in the existing robbery statute and the robbery statute has not changed materially since Hayden. So I think Hayden is authoritative, and it tells you that under a categorical analysis, Nevada robbery suffices. Well, now, what about our Scherbondy case? The Scherbondy case? And what does that say, Your Honor? I'm sorry. Well, that was one of the original Taylor cases. It goes back a few years now. But it just raised the question as to whether the categorical analysis can ever save you if the language of the statute is so broad that it goes beyond. Well, I would agree that that were the principle here if this case had been wrongly decided under that property problem. But since it wasn't, I think we're still within the law here. And I need to make two more points very quickly. One is there is adverse authority that the court isn't aware of. Adverse to the government's position, it's United States v. Eckerd, 936F3-444-450. In the context of a block burger analysis, the court says there that Nevada robbery requires some showing of a threat. I want to make the court aware of that, but I contend still that Hayden is not in the Supreme Court case. It's not referenced in Eckerd. All right. Is Eckerd in any of the briefs or any of the materials? No, it isn't, Your Honor. Would you please, before leaving the courtroom, provide counsel with a copy of that cite plus three copies for the bench? I can get the court three copies. I don't have three with me. There's a form that Mr. Benson will have that you can fill out. Very well. Thank you. I'll do that. Just the citation is all we really need. I will, Your Honor. And I see I'm out of time. Yes, you are out of time, counsel. Thank you. We will hear some more from Ms. Traum. You have some reserve time. Thank you. I think I'm still looking at his reserve time. Let me be very quick. I have seen the Eckerd case before. I think it acknowledges under a block burger analysis that no threat is required under Nevada law. And let me just say briefly, very briefly, on the robbery issue, I think the main lesson of James is that we defer to what the Nevada Supreme Court says about its own law, and that to find that there either is a element of the element test is satisfied here, or actually even the otherwise test, given all of the defect, I mean, given all of the overbreadth problems in this case, would require this Court to sort of part company with the Nevada Supreme Court about the breadth of its own law. It has a reason for having a very broad law, which is it wants to sustain convictions for robbery, which is at odds with our purpose here in deciding where those boundaries actually lie. Let me just, Judge Wardlaw, you had asked about the government's closing. I do just want to tell you that the government did say, in talking about the motivation to lie, that if she had a motivation to lie, she would have been definitive from the start. The government did argue that. And then it went on to make the plain statement, Ms. Reeder's testimony was credible. So it is standing behind her testimony. It is not distinguishing sort of, I mean, it is trying to sort of put in perspective for terrible ID. But the truth of the matter is that if you have a gun case with no physical evidence linking the gun to the defendant, you need to have somebody who puts that gun in the defendant's possession. Ms. Reeder was that person. Mr. Schneider was never asked to testify at trial. We don't know why. The jury had notes about that. They were interested in his testimony, I think. I think that's what those notes tell us. And importantly here, the jury wanted to hear everything. That's what their note says at 298 of the record. Then when they were asked to be more specific, they said they were interested in the ID. Now, the jury doesn't have the testimony in front of them. They said about from the sidebar to the beginning of cross-examination. Well, what actually got lopped off of there was a good portion of the failed ID. So that they actually didn't actually get their request filled in addition to being deprived of important information, which the jury themselves said that they wanted. They wanted the cross-examination. This jury couldn't have been more clear about that. Somebody wanted to hear it. And then they redacted that part of their request and focused on the ID, which they also didn't get. I think that the prejudice in this case is clear. Thank you, counsel. Thank you very much for your time. Your time has expired. The case just argued will be submitted for decision, and we will hear argument in the last case of the afternoon, which is United States v. Chapman.
judges: O'scannlain,hawkins,wardlaw